CABLE NEWS NETWORK,
INC., Plaintiff,

v.

AMERICAN BROADCASTING COMPA-
NIES, INC., CBS, Inc., and National
Broadcasting Company, Inc., and Ron-
ald W. Reagan, as President of the Unit-
ed States of America, James A. Baker,
III, as Chief of Staff for the President
of the United States of America, Larry
Speakes, as Deputy Press Secretary, and
as Apparent Acting Press Secretary, to
the President of the United States of
America, and Alexander M. Haig, as
Secretary of State of the United States
of America, Defendants.

CBS, INC., Plaintiff,

v.

Ronald W. REAGAN, as President of the
United States of America and Larry
Speakes, as Principal Deputy Press Sec-
retary, and as Apparent Acting Press
Secretary to the President of the United
States of America, Defendants.

Civ. A. Nos. 81–871A, 81–1329A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 28, 1981.

John J. Dalton, Robert L. Mote, Ralph H. Greil, Steven W. Korn, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Cable News Network, Inc.

D. Robert Cumming, Carey DeDyne, Sutherland, Asbell & Brennan, Atlanta, Ga., James Loftis, Bergson, Borkland, Margolis & Adler, Washington, D. C., for American Broadcasting Companies, Inc.

David Aufdenspring, Eugene Partain, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., David Boies, Cravath, Swaine & Moore, New York City, for CBS, Inc.

Matt Patton, Kilpatrick & Cody, Atlanta, Ga., William Hegarty, Cahill, Gordon & Reiniel, New York City, for National Broadcasting Co., Inc.

Robert Castellani, Nina Hunt, Asst. U. S. Attys., Atlanta, Ga., William G. Cole, Dept. of Justice, Washington, D. C., for Ronald W. Reagan, James A. Baker, III, Larry Speakes and Alexander M. Haig.

## ORDER

ORINDA D. EVANS, District Judge.

This consolidated action is now before the Court on the Motion for Preliminary In- junction of American Broadcasting Compa- nies, Inc. ("ABC") and National Broadcast- ing Company, Inc. ("NBC"), Defendants in Civil Action No. C81–871A, and the Motion for Preliminary Injunction of CBS, Inc. ("CBS"), Plaintiff in Civil Action No. C81– 1329A. Both Motions seek injunctive relief from recent action of the White House Press Office excluding all television media representatives from covering certain White House and presidential events. Based on the evidence presented at a hear- ing on July 17, 1981, and the briefs and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

## A. FINDINGS OF FACT

The instant litigation began in May, 1981, when Cable News Network filed suit in Civil Action No. C81–871A, alleging that the White House Press Office and the three network Defendants had acted in violation of CNN's constitutional rights in allegedly giving ABC, CBS, and NBC favored status in the coverage of certain White House events denominated as "limited coverage" events by the litigants herein.

Digressing briefly to explain background facts and terminology pertinent to the within Order: the announced policy of the Reagan administration is to permit the full- est press coverage of White House and presidential activities possible under the cir- cumstances. To that end, the Press Office permits "open coverage" of most of such events. Where coverage is open any prop- erly accredited member of the media may attend.

Sometimes, however, space limitations or other considerations require limiting the number of media representatives who may cover a given event, to wit, "limited cover- age." The Reagan administration, as well as prior administrations, has handled these situations by designating a pool of media representatives who may attend. The obli- gation of those in the pool is to share their material with those media representatives

not included. Traditionally, a very small pool, called a "tight pool" has been used when it has been deemed necessary to restrict media attendance to no more than thirteen persons (which includes one television crew of five persons; the television representation in the tight pool has been rotated among CBS, ABC, and NBC). Also, a so-called "expanded pool" consisting of more than thirteen media representatives, has been used when some numerical limitation has been deemed necessary, but where more than thirteen persons can be accommodated. Both the "tight pool" and the "expanded pool" include representatives of the print and the television media.

Returning to the chronological sequence of events: CNN's lawsuit triggered an immediate change in the Press Office's method of selecting television representatives for White House press pools. On June 4, 1981, the Press Office announced that effective July 10, 1981, for all limited coverage events, "This office will post the total number of spaces available for television media representatives. The television media representatives themselves will determine who will occupy the available spaces and so inform this office by the time designated."

On July 2, 1981, a notice was posted at the White House Press Office indicating that five spaces[1] for television media representatives would be available in the July 10, 1981 White House press pool. It stated that the television media representatives should make the selection called for by the June 4 announcement and supply the names to the Press Office by Noon, July 1.

The next development occurred on July 8, 1981, when counsel for the White House Press Office stated at an in-chambers hearing (see Transcript of Chambers Conference July 8, 1981, at 17) that

It, by the way, is not a situation where a majority can out-vote a minority. It is a request for a consensus with the implied threat that if such a consensus cannot be agreed to, then there may be no coverage of the President by the television media until they arrive at that consensus. (Transcript of Chambers Conference, July 8, 1981, at 17).

No consensus was reached.[2] On July 9 the Press Office announced the press pool assignments for July 10, 1981, which included eight representatives of the print media only. The announcement concluded, "NOTE: Since the television media representatives have not complied with the notices posted on June 4 and July 2, 1981, this pool does not include the television media representatives."

The Court finds that the Press Office's sole purpose in excluding television media representatives from limited coverage events was to attempt to force them to work out among themselves a satisfactory method for selecting which representatives will cover various limited coverage events, so as to reduce or minimize the White House Press Office's involvement in making the individual selections.

On July 9 the Court granted ABC and NBC's motion for a temporary restraining order against implementation of the July 9 policy of exclusion of television media from limited coverage White House events. Im-

---

1. It was explained at the hearing that "five spaces" refers to a sufficient number of spaces for one television crew consisting of five persons.

2. No evidence was introduced at the July 17 hearing concerning any attempt of the television media to reach the agreement called for by the June 4 announcement, although there are some references in the record herein (see First Stipulation of Fact, paragraphs 29 and 30, filed July 28, 1981; ABC's Motion for Joinder of National Association of Broadcast Employees and Technicians, filed July 9, 1981) to a possible impediment which might arise from a provi-

sion in NBC and ABC's respective contracts with their technicians' union, which prohibits these networks from accepting non-union material such as would be produced by CNN's non-union personnel. Also, some counsel opined that the self-selection policy was "inherently unworkable." Some expressed the opinion that it was not workable because it was impossible to determine from the face of the policy who constituted the "television media." Counsel for the White House Defendants stated, however, that he felt the four networks (ABC, CBS, NBC, and CNN) before the Court were those directly affected by the policy.

mediately thereafter, CBS filed Civil Action No. C81–1329A asking for essentially[3] the same relief as that sought by ABC and NBC on their cross-claims in the companion case. The preliminary injunction hearing was held on July 17, 1981. The facts were presented to the Court by stipulation.

The instant order does not deal with CNN's claims for injunctive relief against the White House Press Office and ABC, NBC, and CBS. These claims have been set for hearing on CNN's Motion for a Preliminary Injunction on August 3, 1981.

## B. CONCLUSIONS OF LAW

In order to grant the preliminary injunction sought by ABC, NBC, and CBS, the following four requirements must first be satisfied: (1) a substantial likelihood that the movant(s) will succeed on the merits; (2) the movant(s) will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant(s) outweighs whatever damage the granting of the proposed injunction might cause the party opposed to the injunction; and (4) the granting of the proposed injunction will not harm or be adverse to the public interest. *See Dallas Cowboys Cheerleaders v. Scoreboard Posters*, 600 F.2d 1184 (5th Cir. 1979); *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 569 (5th Cir. 1974). As the court in *Canal Authority* stated, "In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Id.* at 573. Therefore, ABC, NBC, and CBS have the burden of persuasion and must clearly show that each of the four prerequisites have been satisfied before this Court will grant the preliminary injunction which they have sought. The Court will now address each of these requirements in the order set out above.

1. Substantial likelihood of success on the merits

■ These Movants contend that the decision by the White House Defendants to totally exclude television representatives from participating in the press pool coverage of presidential activities and other White House events, while continuing to allow pool participation by representatives of other forms of news media, constitutes a violation of two amendments to the United States Constitution: the First Amendment, by interfering with the rights of access of the press to coverage of news events and by interfering with the right of the public to receive information covering the activities and operation of the government; and the Fifth Amendment, by interfering with the rights of the press in an arbitrary and unreasonable manner in violation of due proc-

---

**3.** The relief sought by ABC and NBC in their Motion is as follows:

> For a preliminary injunction to restrain and enjoin Ronald W. Reagan, as President of the United States of America, James A. Baker, III, as Chief of Staff for the President of the United States of America, and Larry Speakes, as Deputy Press Secretary, and apparent Acting Press Secretary (the "White House Defendants"), their agents, servants, employees, attorneys and all other persons in active concert or participation with them from putting into effect the self-selection policy announced in the June 4, 1981 memorandum to "All Television Media Representatives" from the Office of the Press Secretary, The White House, and from otherwise changing in any way the present practice with respect to the participation by television media representatives in the coverage of Presidential events pending further order of this Court.

The specific remedy sought by CBS in its Motion is as follows:

> Enjoining defendants Ronald W. Reagan and Larry Speakes, and any other persons acting under their direction or supervision or otherwise in concert with them, pending trial herein or further order of the Court, from excluding CBS and other television news organizations from access to limited coverage White House events and presidential activities to which other news organizations are admitted; and
>
> Enjoining defendants Ronald W. Reagan and Larry Speakes, and any other person acting under their direction or supervision or otherwise in concert with them, pending trial herein or further order of the Court, from changing in any way the present practice with respect to the participation by television media representatives in the coverage of presidential events.

ess and by treating the television media in a different manner than other forms of news media in violation of equal protection. The issues raised by the constitutional claims of the Movants are interrelated, as are the defenses put forth by the White House, and the Court will begin its analysis by discussing the rights which have been asserted by both sides.

The Court recognizes that there is lacking a clarity and consensus of thought concerning the right of the public and the press to access to information about the workings of government. However, from the different views expressed on this issue there can be discerned a generally held opinion that there does exist a limited right of the public and the press to access to information concerning governmental activity. In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), Chief Justice Burger, in announcing the judgment of the Court in an opinion joined by Justices White and Stevens, said:

> The First Amendment, in conjunction with the Fourteenth, prohibits governments from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government. (448 U.S. at 574, 100 S.Ct. at 2826, 65 L.Ed.2d at 988)

He then recognized that "[F]ree speech carries with it some freedom to listen." *Id.* 448 U.S. at 576, 100 S.Ct. at 2827, 65 L.Ed.2d at 989. In his concurring opinion in *Richmond Newspapers*, Justice Stevens went further, saying:

> Twice before, the Court has implied that any governmental restriction on access to information, no matter how severe and no matter how unjustified, would be constitutionally acceptable so long as it did not single out the press for special disabilities not applicable to the public at large .... Today, however, for the first time, the Court unequivocally holds that

> an arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment .... I agree that the First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, ... (448 U.S. at 582–83, 100 S.Ct. at 2830–31, 65 L.Ed.2d at 993–94)

However, Justice Brennan, joined by Justice Marshall, was more restrained in his concurring opinion, wherein he said:

> While freedom of expression is made inviolate by the First Amendment, and, with only rare and stringent exceptions, may not be suppressed, (cites omitted), the First Amendment has not been viewed by the Court in all settings as providing an equally categorical assurance of the correlative freedom of access to information (cites omitted). Yet the Court has not ruled out a public access component to the First Amendment in every circumstance. Read with care and in context, our decisions must therefore be understood as holding only that any privilege of access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security and confidentiality. (cites omitted). These cases neither comprehensively nor absolutely deny that public access to information may at times be implied by the First Amendment and the principles which animate it. (448 U.S. at 585–86, 100 S.Ct. at 2832–33, 65 L.Ed.2d at 995–96)

The Supreme Court appeared to take a more restrictive view of the First Amendment in several earlier cases. In *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965), the Court said:

> For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment

right. The right to speak and publish does not carry with it the unrestricted right to gather information.

Citing *Zemel* and other cases, the Court in *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972), stated:

> It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.

However, the Court did recognize that "news gathering" qualifies for some First Amendment protection, and said "without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681, 92 S.Ct. at 2656. In discussing a press/general public distinction, the Court in *Pell v. Procunier*, 417 U.S. 817, 834–35, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974), said:

> The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally. It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, .... It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court.

In his dissent in *Saxbe v. Washington Post Co.*, 417 U.S. 843, 860, 94 S.Ct. 2811, 2819, 41 L.Ed.2d 514 (1974), a companion case to *Pell, supra,* Justice Powell expressed his view as follows:

> It goes too far to suggest that the government must justify under the stringent standards of First Amendment review every regulation that might affect in some tangential way the availability of information to the news media. But to my mind it is equally impermissible to conclude that no governmental inhibition of press access to newsworthy information warrants constitutional scrutiny. At some point official restraints on access to new sources, even though not directed solely at the press, may so undermine the function of the First Amendment that it is both appropriate and necessary to require the government to justify such regulations in terms more compelling than discretionary authority and administrative convenience.

The right of access asserted by the press is identical, in purpose, to the right of access of the public in general. Justice Powell recognized this in *Saxbe, supra* at 863, 94 S.Ct. 2811 at 2821, saying in his decision:

> An informed public depends on accurate and effective reporting by the news media. No individual can obtain for himself the information needed for the intelligent discharge of his political responsibilities. For most citizens the prospect of personal familiarity with newsworthy events is hopelessly unrealistic. In seeking out the news the press therefore acts as an agent of the public at large. It is the news by which the people receive that free flow of information and ideas essential to intelligent self-government. By enabling the public to assert meaningful control over the political process, the press performs a crucial function in effecting the societal purpose of the First Amendment.

Justice Brennan, in his concurrence in *Richmond Newspapers, supra,* shared this view, saying:

> ... the media's right of access is at least equal to that of the general public, ... As a practical matter, however, the institutional press is the likely, and fitting, chief beneficiary of a right of access because it serves as the "agent" of the interested citizens, ... (448 U.S. at 584, n. 2, 100 S.Ct. at 2831, n. 2, 65 L.Ed.2d at 994, n. 2)

In *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir.1977), the court apparently recognized a limited right of access of the public, saying:

> The first amendment's protection of a citizen's right to obtain information con-

cerning "the way the country is being run" does not extend to every conceivable avenue a citizen may wish to employ in pursuing this right. (at 129)

The Fifth Circuit, in *Garrett v. Estelle*, 556 F.2d 1274, 1277 (5th Cir. 1977), stated, "News gathering is protected by the first amendment, . . . [t]his protection is not absolute, however." The court in *Garrett* followed the principle enunciated in *Pell, supra*, and *Saxbe, supra*, that the press does not have a constitutional right of special access to information not available to the public generally. In *Lewis v. Baxley*, 368 F.Supp. 768 (N.D.Ala.1973), a three-judge court found that newsmen have a First Amendment right to "reasonable access" to "certain items" of news, saying:

Nevertheless, inherent in the First Amendment right of freedom of the press is a limited right of reasonable access to certain kinds of news. It is apparent that the First Amendment right to publish must logically include to *some* degree a right to gather news fit for publication. Freedom to publish news, without some protected ability to gather it, would render freedom of the press an unduly gossamer right. (at 775) (emphasis in original)

Having carefully reviewed the few cases relevant to this issue, this Court finds that the rights guaranteed and protected by the First Amendment include a right of access to news or information concerning the operations and activities of government. This right is held by both the general public and the press, with the press acting as a representative or agent of the public as well as on its own behalf. Without such a right, the goals and purposes of the First Amendment would be meaningless. However, such a right of access is qualified, rather than absolute, and is subject to limiting considerations such as confidentiality, security, orderly process, spatial limitation, and doubtless many others.

■ Having determined that there does exist a limited right of the public and the press, under the First Amendment, to access to information concerning governmen-

tal activities, this Court must now address the existence and alleged violation of such a right in the present case. In order to best pursue this analysis, some comments by Justice Brennan in *Richmond Newspapers, supra*, are helpful:

. . . An assertion of the prerogative to gather information must accordingly be assayed by considering the information sought and the opposing interests invaded.

This judicial task is as much a matter of sensitivity to practical necessities as it is of abstract reasoning. But at least two helpful principles may be sketched. First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. . . . Second, the value of access must be measured in specifics . . . . what is crucial in individual cases is whether access to a particular government process is important in terms of that very process. (448 U.S. at 588, 100 S.Ct. at 2834, 65 L.Ed.2d at 997)

The specific information sought in this case is nonexistent at this time; it is whatever information is disclosed or revealed during the pool coverage of presidential activities, as well as the visual depiction of such presidential activities. In simple terms, the Movants seek to show and tell the general public what the President and his staff are saying and doing during periods of pool coverage. It is undisputed that there is a history of pool coverage of presidential activities going back through several past Administrations in which television news representatives took part. In this sense there is an "enduring and vital tradition of public entree" (through the press as agents) to the presidential activities covered by press pools. It is also clear that pool coverage of presidential activities is important to the President. A public awareness and understanding of the President's behavior facilitates his effectiveness as President. Such public insight is also necessary for a determination by the public of the adequacy of the President's performance.

The television media has had access to White House pool coverage for many years. This Court finds that under the First Amendment, they have a limited right of access to White House pool coverage in their capacity as representatives of the public and on their own behalf as members of the press. This does not, however, end the Court's inquiry. It is necessary that the Court balance the interest to be served by the sought-for newsgathering activity against the interest served by the governmental restraint. *See Borreca v. Fasi*, 369 F.Supp. 906 (D.Haw.1974).

The Court finds that the interest of the public in having the television media present at "limited coverage" White House events, while not overwhelming, cannot be denominated as insubstantial. On the one hand, since the print media are present at all such events, the public has access to pertinent information through the print media; there is no total blockage of the free flow of information.[4] On the other hand, it cannot be denied that television news coverage plays an increasingly prominent part in informing the public at large of the workings of government. Many citizens likely rely on television as their sole source of news. Further, visual impressions can and sometimes do add a material dimension to one's impression of particular news events. Television film coverage of the news provides a comprehensive visual element and an immediacy, or simultaneous aspect, not found in print media. Finally, the importance of conveying the fullest information possible increases as the importance of the particular news event or news setting increases. To most Americans, presidential activities rank higher in importance than those of any other public official. Therefore, the Court concludes that the public has a significant interest in con-

tinued television participation in White House pool coverage.

The Court now turns to an evaluation of the interest served by the governmental restraint involved here, namely, the total exclusion of television media from limited coverage White House events. The Court is at a loss to find any direct governmental interest served by this policy.[5] No facts or argument have been presented to the Court suggesting that the administration actually desires cessation of television coverage. Nor has the Press Office advanced any reason such as considerations of security or space limitation for refusing television coverage. Rather, the Press Office appears to rest its argument on the legal premise that since there is no right of access, no justification for exclusion is required. As the Court has already determined that there is a limited right of access, the argument cannot be factored into the balancing of interests.

Having applied the proper balancing test, the Court finds that the total exclusion of television representatives from White House pool coverage denies the public and the press their limited right of access, guaranteed by the First Amendment of the Constitution of the United States. Therefore, the Court concludes that Movants have shown a substantial likelihood of success on the merits of their First Amendment claim.

2. Irreparable injury to the Movants

In *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), the Court said, "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." This Court finds that the movants in this case will suffer irreparable injury if the injunction is not granted. If television

---

**4.** Indeed, some might argue that print media news coverage provides more in-depth analysis than does television news coverage.

**5.** It could be argued that since the reason for the exclusion was to induce the television media to arrive at a "self-selection" agreement, which would reduce the Press Office's administrative tasks relative to pool selection, that the

governmental interest is an interest in cutting red tape—a valid interest. However, it is not at all clear—at least not from this record—that exclusion of television from White House pools can be reasonably expected to achieve a self-selection policy. Therefore this interest is, in the Court's view, too attenuated to be deemed significant.

crews are totally excluded from White House pool coverage, the unique continuous visual element of television news coverage will be denied to the public and the press. Such film imagery which is so vital to television reporting cannot meaningfully be replaced by still photographs provided by the non-television participants in pool coverage. By totally excluding television participants, a complete visual record of the Presidential activities covered by the press pools is lost forever. This clearly constitutes irreparable injury to ABC, NBC, and CBS, as well as the public.

### 3. Balancing of the injuries

The Court finds that the threatened irreparable injury to the movants substantially outweighs any minimal damage likely to be suffered by the White House if the proposed injunction is granted. The injury to the First Amendment rights of the public and the press threatened by total exclusion of television representatives has already been described. Any potential injury to the White House Defendants resulting from a prohibition of total exclusion of television representatives would merely involve some minor inconvenience to the White House press staff. The proposed injunctive relief would not require the White House to create a particular type of pool system, it would merely prohibit the threatened total exclusion.

### 4. The effect on the public interest

The pending analysis should clearly indicate that the public interest will be significantly benefitted, and in no way harmed, by the granting of the injunctive relief sought. Television participation in White House pool coverage benefits the public by informing it of the activities of its government.

The Court hereby finds that all four prerequisites for granting a preliminary injunction have been satisfied by the Movants. Therefore, the Joint Motion for a Preliminary Injunction of ABC and NBC and the Motion for a Preliminary Injunction of CBS are hereby GRANTED. The White House Defendants are hereby EN-

JOINED from totally excluding television news representatives from participating in pool coverage of Presidential activities and White House events until a trial on the merits can be held in this case. This preliminary injunction does *not* prohibit the White House Defendants from placing some burden or responsibility on television news representatives to formulate an appropriate system of pool participation or implement the policy set forth in the notice of June 4, 1981, in some manner other than total exclusion.