SOCIETY OF PROFESSIONAL JOURNALISTS, a Utah non-profit corporation, KUTV, Inc., KSL Radio and Television, KTVX T.V., KUED, KALL, the Kearns-Tribune Corporation, Deseret News Publishing Company, the Ogden Standard Examiner, the Logan Herald Journal, Associated Press, United Press International, and National Broadcasting Company, Plaintiffs,

v.

The SECRETARY OF LABOR, Defendant.

EMERY MINING CORPORATION, a Utah corporation, Plaintiff,

v.

The UNITED STATES SECRETARY OF LABOR, Defendant.

Civ. Nos. C–85–0070W, C–85–0166W.

United States District Court, D. Utah, C.D.

Aug. 21, 1985.

Arthur F. Sandack, Salt Lake City, Utah, Michael H. Holland, Earl R. Pfeffer, United Mine Workers of America, Washington, D.C., for United Mine Workers.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on the defendant Secretary's motion for summary judgment. The motion was orally argued on May 9, 1985. The plaintiffs (other than Emery Mining Co.)[1] were represented by Patrick A. Shea and David L. Deisley. The defendant Secretary was represented by Joseph W. Anderson and Alan Yamamoto. The matter was taken under advisement, and the court has since carefully reviewed the memoranda submitted by counsel and various authorities that bear on the issue involved in the motion. Being now fully advised, the court renders the following decision.

### Background

On December 19, 1984, a fire broke out in the Wilberg Mine, a coal mine near Price, Utah. The fire killed 27 miners. On December 31, the Mine Safety and Health Administration (MSHA) launched an investigation into the cause of the fire. As part of the investigation, MSHA decided to conduct formal hearings and asked several people to give sworn testimony to be taken down verbatim by a court reporter. MSHA invited several groups to send non-testifying representatives to the hearings, but closed the hearings to the press and the public. The hearings began on January 21, 1985.

When the plaintiffs, who are various news-reporting organizations, discovered that they were being excluded from the hearings, they brought this action. They demanded access to the formal hearings then being conducted by MSHA personnel in Price, Utah. The plaintiffs asked for a temporary restraining order to prevent MSHA from conducting the formal hear-

Samuel O. Gaufin, David L. Deisley, Patrick A. Shea, Salt Lake City, Utah, for Society of Professional Journalists.

James B. Lee, Raymond S. Etcheverry, Salt Lake City, Utah, for Emery Min. Corp.

Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah, Timothy M. Biddle, Washington, D.C., for Secretary of Labor.

---

1. Plaintiff Emery Mining Co. is not involved in this motion.

ings behind closed doors. They asked that MSHA be enjoined from continuing the hearings unless a pool reporter was allowed to be present. On January 25, 1985, after a brief hearing, this court issued the requested temporary restraining order. A pool reporter presented himself at the hearings in Price and requested admittance. The MSHA personnel conducting the hearing thereupon recessed the hearings pending the preliminary injunction hearing this court had scheduled.

The preliminary injunction hearing was held on February 1, 1985. In addition to the plaintiffs and the defendant Secretary, the United Mine Workers of America (UMWA) were represented at the hearing. The UMWA moved to intervene in the proceedings, and that motion was later granted. Following the preliminary injunction hearing, this court took the matter under advisement.

On February 8, this court issued a preliminary injunction which differed from the temporary restraining order. Under the terms of the preliminary injunction, the hearings could be closed if the participants were limited to representatives of MSHA, the Utah Industrial Commission, and the UMWA. If anyone besides representatives of these groups, the witness, and the court reporter were allowed to be present, the hearing would have to be open to the press and the public.

The operator of the Wilberg Mine, Emery Mining Co., was dissatisfied at being excluded from the hearings and brought a separate action against the Secretary of Labor. On February 14, 1985, this court consolidated Emery Mining's case with this case and modified the preliminary injunction to allow Emery Mining to be among those who could participate in the closed hearings. The hearings were resumed with personnel from MSHA, the Utah State Industrial Commission, the UMWA, and Emery Mining all present and participating. The press and the public were exclud-

ed. The hearing were completed several months ago.[2]

The present motion for summary judgment is centered on one issue: whether the Constitution or federal law requires that the formal fact-finding hearings conducted by MSHA be open to the press and public. The defendant Secretary argues that summary judgment must be granted in his favor. He claims that he is not obligated by either federal statute or the United States Constitution to allow the press or the public to attend hearings conducted by MSHA.

The plaintiffs, in response, claim that the constitutional guarantees of free speech and freedom of the press require this type of hearing to be open to the press and the public. They also claim that hearings of the type conducted by MSHA in Price must be public under 30 U.S.C. § 813(b). This court holds that there is a constitutionally protected right of access to formal administrative proceedings of this type. Therefore, the summary judgment motion is denied.

### Statutory Requirements

█ The plaintiffs argue strenuously that there is a statutory requirement under 30 U.S.C. § 813(b) that any formal hearings conducted by MSHA to investigate coal mine accident must be public. However, the language of § 813(b) does not support the plaintiffs' argument. It is permissive language, not mandatory.

The pertinent part of § 813(b) states that the Secretary *may* conduct public hearings.

> For the purpose of making any investigation of any accident or other occurrence relating to health or safety in a coal or other mine, the Secretary may, after notice, hold public hearings, and may sign and issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths.

---

**2.** The Secretary has not raised the issue of mootness, presumably because the situation is "capable of repetition, yet evading review," and thus

excepted from the mootness doctrine. *See Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

30 U.S.C. § 813(b). The statute does not require the Secretary to hold in public any and all hearings conducted for the purpose of investigating a mine disaster. It simply empowers him to conduct public hearings. Therefore, the plaintiffs cannot claim a right of access under § 813(b).

The plaintiffs also argue that § 813(b) suggests that Congress intended all investigatory hearings into mine accidents to be conducted formally and in public. While it is unclear whether that was Congress's intent or not, it is clear that that intent is not embodied in the statutory language. The Secretary is not required to hold all mine accident investigation hearings as public hearings under § 813(b).

### Constitutional Right of Access

■ The United States Constitution does not expressly require either Congress or the Executive to hold any of their meetings in public. There is also no common-law right to attend meetings of government bodies. *See* Note, *Open Meeting Statutes: The Press Fights for the "Right to Know,"* 75 Harv.L.Rev. 1199, 1203 (1962). Indeed, the tradition in England was to hold legislative debate in secret and to prohibit publication of legislative proceedings. *See id.;* Watkins, *Open Meetings Under the Arkansas Freedom of Information Act*, 38 Ark.L.Rev. 268, 271 (1984). This tradition was exported to colonial America. *See* Watkins, *supra*, at 271.

The tradition of closed legislative proceedings resulted in both the Continental Congress and the Constitutional Convention conducting their proceedings in secret. *See id.* It is not surprising, therefore, that the Framers of the Constitution did not include an express provision in the Constitution that required Congress to deliberate in public. Even though not constitutionally required, it was not long before both the House and Senate began to hold their sessions in public on a regular basis. *Id.* The Senate has done so since 1794, and the House since the War of 1812. *Id.* The increasingly important committee sessions, however, have been routinely open to the public only since the mid-1970's. *Id.*

Although Congress is not expressly required to hold open meetings by the United States Constitution, thirty-four of the states do have express constitutional requirements that their state legislature meet in public. *See* Note, *supra*, at 1203. In the other states, the legislative sessions are open by custom. *Id.* None of the states, however, require by an express constitutional provision that any meetings or proceedings other than legislative sessions be open to the public.

Although the executive branches of the various state governments and the federal government are not expressly required by constitutional provision to open their proceedings, they are required to hold some of their meetings in public by law. All fifty states, the District of Columbia, and the federal government have some form of a "government in the sunshine" act. *See* Watkins, *supra*, at 268. These acts have never been held to be constitutionally required, however, and derive from vigorous lobbying of legislative bodies by the news media rather than any action in the courts. *See* Watkins, *supra*, at 272.

Although legislatures have generally been more active in promoting a right of access than the courts, the courts have been active in finding a constitutional right of access in one area. The area is that of judicial proceedings. The sixth amendment gives only the defendant the right to a public trial; it does not give anyone other than a criminal defendant standing to assert the right. *See* U.S. Const. amend. VI. However, the Supreme Court has found that the press and public have a right of access to criminal trials even where the defendant expressly waives his right to a public trial and desires the proceedings to be closed. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). This right of access is based on the first amendment freedoms. *See id.* This right is not absolute, since the press and public can be excluded if the court finds a compelling reason why the

proceedings must be closed. But the right exists.

The right of access to judicial proceedings has been extended beyond criminal trials. Some courts have found a right of access to civil trials. *See, e.g., Publicker Indus. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir.1984). The press have a first amendment right of access to presidential press conferences. *Cable News Network v. American Broadcasting Cos.,* 518 F.Supp. 1238 (N.D.Ga.1981). This court is asked by the plaintiffs in this case to extend the right of access to formal administrative fact-finding hearings. This court does so.

### Freedom of the Press

The plaintiffs ask this court to find a right of access in the freedom of the press guarantee of the first amendment. They claim that they are constitutionally entitled to access even though the public might not be. They claim that the right to publish information is expressly given the press in the first amendment, and argue that the right of access to information is a necessary part of publishing that information. This court agrees that there is a right of access in this case. This court finds, however, that the right of access is based on the penumbra of the first amendment guarantees, not solely on the freedom of the press guarantee.

There are weighty practical problems in finding that members of the press have a greater right of access than the general public. One difficulty is in determining whether a person desiring access is indeed a member of the press or is simply a member of the general public.[3] For example, is a person who claims to be a free-lance reporter, but has never had any of his work published, a member of the press or not?

The distinction between press people and the general public is too vague and indistinct to base a constitutional right upon.

Another difficulty in finding that the press has greater rights than the public is that the policies behind allowing a right of access may not be served if the right is limited. If members of the general public cannot attend a hearing, then the only information they can receive will have been filtered through the press. Although one might expect that the press would report fully on all matters of public interest, that is frequently not the case. *See Pechter v. Lyons,* 441 F.Supp. 115 (S.D.N.Y.1977). A press right of access is often an inadequate substitute for a right of access for all interested members of the public. Allowing the press to decide what the public will hear is subject to the same abuse, and perhaps to a greater degree, as the government itself deciding what the public and press will hear. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 14, 98 S.Ct. 2588, 2596, 57 L.Ed.2d 553 (1978).

In addition to the practical problems in finding a right of access solely for members of the press, there are problems with precedent as well. The Supreme Court has ruled out a right of access based on the freedom of the press guarantee standing alone. *See Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974). *See also Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978).[4] This court will follow the Supreme Court, as it must, and not base the right of access solely on the freedom of the press guarantee of the first amendment.

### First Amendment Right of Access to Judicial Proceedings

The Supreme Court, in a plurality decision, found a right of access to criminal

---

**3.** The difficulty of identifying members of the press has been made more difficult by the expansion of methods of reporting the news. The term "press" can refer to the traditional media such as newspaper, magazine, television, and radio news reporters, as well as the non-traditional press such as writers of non-fiction books or articles and the creators of documentary films.

**4.** Although *Houchins* was merely a plurality opinion, it seems clear that most, if not all, of the current members of the Court agree that the press has no constitutional right of access superior to that of the general public. *See Houchins,* 438 U.S. at 13–14, 98 S.Ct. at 2596 (opinion of Burger, C.J., joined by White and Rehnquist, JJ.); *id.* at 19, 98 S.Ct. at 2599 (Stevens, J., dissenting, joined by Brennan and Powell, JJ.).

trials in the penumbra of the first amendment guarantees of freedom of the press, freedom of speech, and freedom of assembly. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The *Richmond Newspapers* case was a clear departure from the earlier Supreme Court ruling in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). A majority of the Court reached basically the same result in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), which made the *Richmond Newspapers* analysis the analysis of the Court.

In *Globe Newspaper,* the Court identified two features of the criminal justice system that explain why a right of access to criminal trials is afforded first amendment protection. *See* 457 U.S. at 605, 102 S.Ct. at 2619. First, criminal trials have historically been open to the press and public. *See id.; Richmond Newspapers,* 448 U.S. at 569, 100 S.Ct. at 2823. Second, the right of access to criminal trials plays a significant role in the proper functioning of the judicial process. *See Globe Newspaper,* 457 U.S. at 606, 102 S.Ct. at 2619; *Richmond Newspapers,* 448 U.S. at 569, 100 S.Ct. at 2823.

Thus far, the right of access has been limited to criminal trials in Supreme Court cases. The Supreme Court has, however, extended the right beyond just the trial itself to include jury voir dire in criminal cases. *Press—Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). In doing so, the Court used the *Richmond Newspapers* analysis. The Court looked to the historical tradition in England and colonial America, and found that jury voir dire has historically been performed in public. *See id.,* 104 S.Ct. at 822–23. The Court then looked to the significance of the role a right of access plays in the jury voir dire process, and found that it plays a crucial role. *See id.,* 104 S.Ct. at 823–24. Consequently, the Court held that a right of access, or presumption of openness, applies to the jury voir dire proceedings in a criminal proceeding.

While the Supreme Court has extended *Richmond Newspapers* beyond just the criminal trial itself, it has not overruled the direct holding of *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). In *Gannett,* the court held that there is no first amendment right of access to a pretrial suppression hearing in a criminal case. The Court in *Richmond Newspapers* was careful not to overrule *Gannett.* In fact, the Court mentioned *Gannett* in passing, thus seeming to indicate that *Gannett* is still good law, in the recent case of *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 2214–15, 81 L.Ed.2d 31 (1984). However, the stage has certainly been set for the overruling of *Gannett,* and its precedential value is in question. *See In re Herald Co.,* 734 F.2d 93 (2d Cir.1984) (reaching a result contrary to *Gannett*). Given the appropriate case, *Gannett* may well be overruled by the Supreme Court.

Indeed, the analysis used by the Court in *Richmond Newspapers* and *Globe Newspaper* supports finding a right of access in civil trials as well as criminal trials. *See id.* Both historical tradition and the procedural importance of openness weigh as heavily in favor of open civil trials as open criminal trials. *See Gannett,* 443 U.S. at 386 n. 15, 99 S.Ct. at 2908 n. 15; *Richmond Newspapers,* 448 U.S. at 599, 100 S.Ct. at 2839 (Stewart, J., concurring). The Second, Third, and Sixth Circuits have all followed the *Richmond Newspapers* analysis in holding that civil trials must be open. *See Westmoreland v. Columbia Broadcasting System,* 752 F.2d 16, 23 (2d Cir.1984); *Publicker Indus. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir.1984); *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1178–79 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984).

### First Amendment Right of Access to Presidential Press Conferences

One court has found that members of the press have a first amendment right to attend presidential press conferences. *Cable News Network v. American Broadcasting*

Cos., 518 F.Supp. 1238 (N.D.Ga.1981). The Cable News court did not carefully track the analysis of the Supreme Court in Richmond Newspapers. It only briefly mentioned that there has been a historical practice of allowing pool coverage of presidential news conferences "going back through several past Administrations." See 518 F.Supp. at 1244–45. The court was no more extensive in its analysis of the value of a right of access to presidential news conferences. See 518 F.Supp. at 1245. Nevertheless, the Cable News court was unequivocal in finding a right of access to events such as presidential news conferences.

The Cable News court's holding is succinctly stated in one quoted paragraph.

Having carefully reviewed the few cases relevant to this issue, this Court finds that the rights guaranteed and protected by the First Amendment include a right of access to news or information concerning the operations and activities of government. This right is held by both the general public and the press, with the press acting as a representative or agent of the public as well as on its own behalf. Without such a right, the goals and purposes of the First Amendment would be meaningless. However, such a right of access is qualified, rather than absolute, and is subject to limiting considerations such as confidentiality, security, orderly process, spatial limitation, and doubtless many others.

518 F.Supp. at 1244. The court's rather broad statement that the right applies to "news or information concerning the operations and activities of government" will undoubtedly be limited in subsequent cases. But the clear import of Cable News is that at least one court has unmistakably found a right of access to non-judicial proceedings using the Richmond Newspapers analysis.

*First Amendment Right of Access to Administrative Proceedings*

This court is convinced that a right of access is necessary to the type of hearing MSHA conducted in this case. Even though it is unclear whether a majority of the Supreme Court would find such a right in this case, nose-count analysis is not always helpful. It is difficult, if not impossible, to predict how each member of the Supreme Court would rule on this new issue. Therefore, this court must merely try to follow the analysis adopted by the Supreme Court in similar cases and examine the same policy considerations the Supreme Court would examine. Following that course, this court holds that a right of access exists in this case.

*Historical Tradition*

There is little historical tradition to examine to determine whether administrative hearings of the type MSHA conducted have generally been open to the public. There does not appear to be a lengthy tradition of even holding administrative fact-finding hearings, since they are of fairly recent origin. However, as discussed above, it is clear that congressional sessions have been open since the early history of our country. Moreover, civil trials, which are analogous to administrative fact-finding proceedings, have historically been open to the public. It seems, therefore, that to the extent that there is a tradition of holding this type of hearing, there is a tradition that the hearings have been open to the public. See Fitzgerald v. Hampton, 467 F.2d 755, 764 (D.C.Cir.1972) ("in administrative hearings, the rule of the 'open' forum is prevailing"). See also 3 K. Davis, Administrative Law Treatise § 14:13 (1980); Pechter v. Lyons, 441 F.Supp. 115 (S.D.N.Y.1977); FCC v. Schreiber, 381 U.S. 279, 292–94, 85 S.Ct. 1459, 1468–70, 14 L.Ed.2d 383 (1965).

The Secretary argues that there is not a tradition of openness in this type of hearing because MSHA has almost always closed its hearings to the public. However, that is not a very good indicator of whether there is a tradition of openness for two reasons. First, MSHA has not held a large number of this type of hearing. It is necessary to examine the broad spectrum of administrative hearings, rather than nar-

row instances, in order to perceive a tradition. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605 n. 13, 102 S.Ct. 2613, 2619 n. 13, 73 L.Ed.2d 248 (1982). Second, MSHA alone controls whether these hearings are open or not. The fact that MSHA has chosen over the past few years to close its hearings is not a significant indicator of whether there is an enduring and vital tradition of public entree to administrative hearings.

### Procedural Importance of Openness

Openness is crucially important to the type of hearings MSHA conducted. A mine disaster that takes twenty-seven lives creates shock and sorrow in the mining community. Even though the disaster may have been the fault of no one, the emotional impact in the community is just as though a murder had taken place. An investigation into the causes of the disaster can create an emotional catharsis that soothes the community sorrow. If someone is responsible, people become aware of that. If no one is at fault, people can become reassured of that. Access to the proceedings, where feasible, ensures that people realize that justice is being done.

Moreover, openness ensures that MSHA properly does its job. Although Congress can conduct oversight hearings, they occur too long after the MSHA hearings to accomplish the purposes gained by openness.[5] Congressional oversight hearings can prevent future mistakes, but they can do little to correct past ones. In contrast, openness at the hearings can allow mistakes to be cured at once.

The natural tendency of governmental officials is to hold their meetings in secret. *See* Note, *Open Meeting Statutes, The Press Fights for the Right to Know*, 75 Harv.L.Rev. 1199, 1202–03 & n. 21 (1962). They can thereby avoid criticism and proceed informally and less carefully. They do not have to worry before they proceed with the task that a careless remark may be splashed across the next day's headlines. But it is exactly that type of public awareness and opportunity to criticize that is the very foundation of our democracy.

Openness safeguards our democratic institutions. Secrecy breeds mistrust and abuse. As Justice Brandeis stated in words often quoted,

Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.

L. Brandeis, *Other People's Money* 62 (1933). A right to open proceedings is necessary to prevent any governmental body from abusing the power it is given.

The federal government, particularly the executive branch, produces a vast amount of information. If the government is given the unfettered discretion to decide what information to make available to the press and the public, it has the power to distort the information and hide the truth. The first amendment guarantees of free speech and free press protect our right to freely criticize the government without fear of censorship by the government. But censorship in speaking and publishing is not the only form of censorship that must be prevented. The process of filtering information—selectively releasing some information while withholding other information—can be effectively used to prevent criticism and hide mistakes. The first amendment guarantees apply to both forms of censorship.

Without a first amendment right of access to some governmental information, our system of government by the people will not work. As James Madison noted,

A popular Government, without popular information, or the means of acquiring it,

---

**5.** As Jeremy Bentham noted, no other check on power can substitute for openness.

Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.

1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827), *quoted in Richmond Newspapers v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814, 2823, 65 L.Ed.2d 973 (1980).

is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

9 *Writings of James Madison* 103 (G. Hunt ed. 1910). *See also Houchins v. KQED, Inc.*, 438 U.S. 1, 30–35, 98 S.Ct. 2588, 2604–07, 57 L.Ed.2d 553 (1978) (Stevens, J., dissenting) (quoting and discussing Madison's comment).

■ The Constitution is not, however, a Freedom of Information Act. *See Houchins*, 438 U.S. at 14, 98 S.Ct. at 2596. There are limits to the right of access. It is doubtful that the right of access would extend to informal interviews or internal agency deliberations. A right of access is not a license to force disclosure of confidential information or to invade the decisionmaking processes of governmental officials. In this case, this court decides only that the press and public have a first amendment right of access to formal administrative fact-finding hearings.

Many times, it is not necessary to enshrine rights in the Constitution. The democratic process itself ensures that many rights are protected even without embodying them in the Constitution. If a majority of the people cherish a particular right, that right will be respected and protected by representative legislatures. The right will become law.

Openness is essential, however, to the proper functioning of democratic processes. Majoritarian pressures are not felt if the majority of the people are unaware or misled about information crucial to their decisions. The cloak of secrecy can be used to hide abuses or disguise mistakes until it is too late to prevent damage from being done. Openness acts as both a preventative and a curative of such abuses.

A right of access is more a procedural right than a substantive right. It is particularly important that procedural rights be embodied in the Constitution. Majoritarian pressures are often sufficient to ensure that substantive rights are protected by law even though they are not based in the Constitution. Procedural rights are less susceptible to protection by majoritarian pressures. Unless the procedure functions properly, a right will not arise. Therefore, a right of access must be constitutionally protected as a procedural right.

### Transcripts of Hearings Cannot Substitute for Openness

The government argues that openness is not essential to the fact-finding process because MSHA has agreed to make a transcript of the hearings available to interested persons as soon as possible. In fact, the plaintiffs did receive transcripts of the hearings at issue here. The government argues that the transcripts are the procedural equivalent of open hearings. By providing a transcript rather than opening the hearings, the government argues, MSHA is able to proceed as it desires in its hearings while still providing the public with the information it desires.

There are, however, several reasons why a transcript cannot replace the right to an open hearing. The most important reason is that MSHA is not obligated to provide a transcript unless a constitutional right requiring disclosure exists. The fact that MSHA provided a transcript this time does not bind it to produce a transcript the next time such hearings are held. The question of whether a right of access exists, therefore, is not answered by simply noting that a transcript was provided in this case.

Moreover, a transcript is not an adequate substitute for an open hearing. Preparation of a transcript requires time. By the time the transcript is ready, the information it contains is stale. In a hearing such as this one, the participants in the hearing can release their own version of the hearing, filtered according to their viewpoint, before the transcript is ready. *See, e.g.,* Plaintiffs' Memorandum Of Points and Authorities in Opposition to Defendant's Motions for a Protective Order and for Summary Judgment, exh. A (containing an excerpt from the *United Mine Worker's Journal* which gives the UMWA's view of

the accident). The press and public are denied access to unfiltered information while it is still fresh. A stale transcript is not an adequate substitute for access to the hearings themselves.

Transcripts are also inadequate because they are incomplete. A transcript can be edited to remove sensitive information without leaving a trace, or embarrassing material, as in the Watergate Tapes, may be "accidentally" deleted. No such opportunity exists in open hearings. Even if there is no purposeful tampering with the transcript, the full flavor of the hearing cannot be sensed from the sterile sheets of a transcript. Emotions, gestures, facial expressions, and pregnant pauses do not appear on the reported transcript. *See* Affidavit of Richard L. Finlinson. Much of what makes good news is lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds.

### The Hearings Are Not Equivalent to Grand Jury Proceedings

The government contends that a right of access is inappropriate because the MSHA hearings must be kept secret just as grand jury proceedings are generally kept secret. But the analogy between MSHA hearings and grand jury proceedings is inapt. Several grounds support secret grand jury proceedings.[6] None apply to the MSHA hearings. The contrast between the two is particularly evidenced by the fact that the secrecy rule regarding grand juries applies to transcripts of the proceedings as well as attendance at the proceedings, while MSHA was willing to provide transcripts in lieu of allowing attendance at its hearings.

The MSHA fact-finding hearings are simply not analogous to grand jury deliberations.

### Conclusion

■ This court holds, in short, that the press and public have a constitutional right of access to the MSHA hearings. Although this court is aware of the possible broad implications of this holding, that consideration should not deter recognition of this important right. Other courts in other cases can determine how far the right should extend. This court's holding is limited to the hearings conducted by MSHA in Price, Utah, that are the basis of this case.

Moreover, to say that there is a right of access to this type of hearing does not mean that all hearings of this type must be open. It means, instead, that the Secretary himself does not have the unfettered right to decide whether the hearings conducted by him are public or not. That decision is for the impartial judiciary.

Because a right of access exists, the government's motion for summary judgment is denied. Even though a right of access exists, however, that right is not absolute. Governmental interests in confidentiality, security, or orderly process may weigh heavily enough to limit the right of access, or even outweigh it. But a governmental interest must be weighty indeed to be protected when a constitutional right is on the other side of the scales.

The Secretary has advanced several governmental interests which he believes justify his decision to close the hearings. The governmental interests advanced by the Secretary are not frivolous. It is true that MSHA personnel can more easily conduct

6. Some of the most important grounds for maintaining secrecy in grand jury proceedings include:
(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.
*Houchins v. KQED, Inc.*, 438 U.S. 1, 35 n. 26, 98 S.Ct. 2588, 2607 n. 26, 57 L.Ed.2d 553 (1978) (Stevens, J., dissenting).

MSHA hearings without the press and public having access to the hearings. It is true that the press does not always report information accurately or fairly. *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (setting forth a litany of press abuses in sensationalizing the Sheppard murder trial). It is true that access to the hearings may spawn unfounded rumors and distorted information. It is true that access to the hearings may, in some cases, hinder the search for truth rather than aid it. Nevertheless, the hearings must be open.

We have agreed as a society to pay the price of holding governmental proceedings in the open in order to preserve our freedom. We have chosen to preserve and encourage free discussion about, and criticism of, our government in order to continually refine our government. In our democracy, the people control the government. A shift from the people controlling the government to the government controlling the people is a shift from democracy to totalitarianism. Administrative difficulties such as those advanced by the Secretary are a small price to pay to entrench the procedural safeguards that keep our society from creeping even slightly closer to totalitarianism. Such difficulties pale in the light of the constitutional rights of free speech and a free press.

It is unclear what further proceedings are necessary in this case. While the Secretary has not yet suggested any counterbalancing governmental interest to overcome the constitutional right this court has found, he has not yet been squarely presented with the opportunity to do so. The Secretary shall have that opportunity if he has anything further he wishes to present.

It is doubtful that there are any governmental interests compelling enough to warrant complete closure of the MSHA hearings. However, limitations on the right of access appear to be essential. The plaintiffs proposed that one pool reporter be allowed to attend the hearings and that one camera be placed in the hearing room so that a video and audio feed could be available to the press and so that the press and the public could watch and hear the live proceedings in a nearby room. Although that arrangement appears to be equitable, this court will delay a final ruling on this issue until both sides have had an opportunity to fully present their evidence and arguments.

Either side may, if it desires, submit further argument and evidence on the issue of whether there is a governmental interest sufficiently weighty to close the MSHA hearings or limit access to them. If necessary, an evidentiary hearing on that issue will be held. Clearly, discovery concerning that issue is necessary, and the Secretary's motion for a protective order must therefore be denied.

Accordingly,

IT IS HEREBY ORDERED that the Secretary's motion for summary judgment and motion for a protective order are both denied.

This order will suffice as the court's action on these motions. No further order need be prepared by counsel.