Arthur D'AMARIO, III, Plaintiff,

v.

The PROVIDENCE CIVIC CENTER AUTHORITY, et al., Defendants.

Civ. A. No. 83–0336–S.

United States District Court, D. Rhode Island.

July 30, 1986.

John H. Hines, Jr., Smithfield, R.I., Stephen M. Miller, Providence, R.I., for plaintiff.

Patricia Hurst, Anthony A. Giannini, Jr., Deputy City Solicitor, Vincent J. Piccirilli, Providence, R.I., for defendant Civic Center.

Boyajian, Coleman & Richardson John Boyajian, Andrew S. Richardson, Providence, R.I., for defendant Frank J. Russo Productions and Gemini Concerts, Inc.

## OPINION AND ORDER

SELYA, District Judge.

In May of 1983, the plaintiff, Arthur D'Amario, III (D'Amario), commenced this civil action against the Providence Civic Center Authority (PROCCA), Gemini Concerts, Inc. (Gemini), and Frank J. Russo (Russo). D'Amario sued under 42 U.S.C. § 1983, invoking the court's federal question jurisdiction. 28 U.S.C. §§ 1331, 1343(3). He demanded declaratory and injunctive relief, together with money damages.

### DRAMATIS PERSONAE

The identity and role of each of the parties to this litigation is of some moment. The leading man—whether hero or villain remains in dispute—is the plaintiff. D'Amario is a freelance commercial photojournalist who describes himself as a "rock photographer." His customary subjects are live musical performances and performing artists, invariably those associated with some variety of so-called "rock" music. (The record admits of no fine distinctions among the subcultures of the art form; the plaintiff's roving lens apparently encompasses the entire spectrum, from soft rock through hard rock and into acid rock.) When D'Amario films a performer or an event, he consigns his work product to a commercial agency, which in turn hawks the snapshots to entertainment-oriented publications. In general, the photos (if and when purchased) are published as accouterments to print media articles.

PROCCA is a public authority created by the Rhode Island General Assembly, *see* R.I.Pub. Laws 1969, ch. 3, §§ 1–26, and thereafter specifically authorized by the Home Rule Charter of the City of Providence, adopted as of January 1, 1983. PROCCA is governed by seven members, five appointed by the mayor of Providence and two elected by the city council from within its own ranks. Originally funded by the issuance of municipal bonds, *see* R.I.

Pub. Laws 1969, ch. 3, § 13, PROCCA also receives direct appropriations from city revenues on an ongoing basis. *Id.* at § 12.

The chief—indeed, sole—raison d'etre for PROCCA's present existence is the operation of the Providence Civic Center (Center). The Center is a substantial facility in downtown Providence, originally constructed under PROCCA's aegis. *Id.* at § 3. Under the enabling legislation, title to the Center will revert to the city when all bonds and notes have been fully amortized. *Id.* at § 23. PROCCA derives the bulk of its current revenues by leasing the Center to various groups for shows, exhibitions, assemblies, conventions, and a variety of kindred functions.

Gemini is a Rhode Island corporation engaged in the business of promoting entertainment events. Russo, the sole officer and shareholder of Gemini, is the corporation's driving force and alter ego. Gemini frequently books acts and events at the Center, leasing the facilities from PROCCA.

Certain better-known personalities, not themselves parties to this litigation, play cameo roles in the drama. They comprise the performing artists—Sheena Easton, Diana Ross, "Blondie," John Cougar, Pat Benatar—whose rock concerts set the stage for the events at issue.

### PROLOGUE

The gravamen of D'Amario's suit is the contention, framed in his amended complaint, that the defendants transgressed the freedom of the press and the plaintiff's rights of free speech, as guaranteed by the first amendment to the federal Constitution, by prohibiting him from taking natural light photographs during certain performances at the Center. On February 28, 1984, this court (Pettine, J.) granted summary judgment in favor of the defendants on the ground that PROCCA's enforcement of the "no camera" rule in the circumstances of this case, *see post,* did not constitute "state action" sufficient to trigger the applicable protections of the Constitution.[1] A

---

**1.** Under 42 U.S.C. § 1983, it is a jurisdictional requisite that the interdicted action be taken "under color of state law." *Perry Education Association v. Perry Local Educators' Associa-*

*tion,* 460 U.S. 37, 45–47, 103 S.Ct. 948, 954–56, 74 L.Ed.2d 794 (1983); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937–42, 102 S.Ct. 2744, 2753–56, 73 L.Ed.2d 482 (1982).

divided panel of the First Circuit reversed, holding that "the *enforcement* of the 'no camera' rule by the Civic Center employees supplies the state involvement nexus." *D'Amario v. Providence Civic Center Authority,* 783 F.2d 1, 3 (1st Cir.1986) (emphasis in original) (*D'Amario I*). The court of appeals remanded for consideration of the validity of the "no camera" rule. *Id.* at 4.

On remand, the case was assigned to a new trier. *See* D.R.I.L.R. 7(g). The determination of state action in *D'Amario I* being the law of the case, this court held a series of conferences and hearings in order to furnish appropriate direction for further proceedings. To abbreviate a somewhat tedious tale, the court bifurcated the issues of liability and damages; and the parties agreed to submit the merits for the court's consideration on a stipulated record as a case stated. The matter was thereafter amplificatively briefed. Oral argument was waived. The liability phase, that is, the validity of the "no camera" rule as a matter of federal constitutional law, was taken under advisement as of July 7, 1986. The court's review, fashioned pursuant to Fed.R.Civ.P. 52(a), follows.

## ACT I

The First Circuit has set forth twin overviews of the salient facts, each written from a slightly different appellate perspective, *see D'Amario I,* 783 F.2d at 1–2; *id.* at 4–5 (Hill, J., dissenting), and the stipulated record now before this court is generally faithful to those accounts. So, a decurtate summary of the setting will suffice.

In the second half of 1982, Gemini promoted five rock concerts at the Center under a "no camera" rule. In each instance, Gemini entered into a contract with the performing artist for the engagement. Each performer insisted that there be no photographs taken during the show and each insisted that a rider to that effect be placed in the contract.[2] Gemini was not the instigator of the ban in any case; to the contrary, the performers insisted upon it, and advised Russo that the condition was "non-negotiable." Gemini hastens to note (and the plaintiff agrees) that it routinely allows photographs to be taken during any and all concerts except those for which the headliner has demanded a "no camera" restriction.

In order to provide a forum for the performances on these five occasions, Gemini entered into one-night leases with PROCCA. The basic document was PROCCA's standard indenture—a form which contains no ban on showtime photography. (In cases where the artist's contract with the lessee/promoter was silent as to the taking of photographs, PROCCA regularly permitted cameras to be used during performances.) In respect to these five concerts, however, Gemini requested the Center to honor the wishes of the performers and to bar photographic equipment from the building. The Center, as was its custom in such instances, acquiesced.[3] It posted signage

---

**2.** The precise language of the contract stipulation comprising the "no camera" rule varied from artist to artist. The agreement with Sheena Easton, for example, provided that "no recording, whether audio or visual, may be made of this performance by any method whatsoever, without written consent of the Artist;" and further required Gemini to post at each entrance to the hall a sign "in large letters" proclaiming that "no camera [would be] ... allowed" within the arena. The agreement with Diana Ross declared that "no portion of the concert or any activity of Artist may be filmed, recorded, broadcast, or reproduced by Promoter or any third party by any means now known or hereafter devised ... [and] Promoter will use all reasonable efforts to prevent members of the audience from entering the Arena in possession of any means of recording Artist's performance."

For the purposes at hand, the exact phraseology of the covenants is beside the point. It suffices to say that each such contract contained at a minimum language barring any filming of the performance, and obligating Gemini to use best efforts to prevent the intrusion of cameras into the auditorium.

**3.** PROCCA had scant bargaining leverage. Approximately 47% of its income, some $3,300,000 annually, was derived from hosting rock concerts. More importantly, the Center historically operated at a loss—but the rock concerts were profitable. The parties to this action have stipulated that any appreciable "loss of revenue from rock concerts would pose an immediate and serious threat to the financial stability of the Civic Center."

to this effect, and alerted its employees to enforce the "no camera" rule throughout each of these shows. The Center's security staff obliged.

D'Amario had a variety of negative experiences with the "no camera" rule. During his first exposure, he gained access to the premises, took a number of snapshots, and was thereafter expelled by PROCCA's personnel. (His film was not confiscated.) On two subsequent dates, he was refused admission because he wanted to bring photographic equipment with him. On a fourth occasion, he was allowed to attend the concert but, on threat of banishment, did not film any of the proceedings. At the time of the fifth concert, he was caught trying to smuggle a camera into the Center and was immediately ejected.

## ACT II

■ In the plaintiff's view, the first amendment is his free pass into the Center to permit his photographic endeavors to proceed. Any cognizable claim in this regard must, however, prescind from his membership in the fourth estate, invoking the freedom of the press: D'Amario's first amendment right to freedom of speech is not directly implicated.

To be sure, entertainment is a form of protected speech, *see Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180–81, 68 L.Ed.2d 671 (1981), and the right to disseminate or display photographs is likewise protected. *E.g., United States v. Thirty-Seven Photographs*, 402 U.S. 363, 367, 91 S.Ct. 1400, 1403–04, 28 L.Ed.2d 822 (1971). The mere fact that the purveyor seeks to make a profit does not strip away the armor of the first amendment. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978). Yet, D'Amario does not claim that the sovereign has abridged his right to sell tintypes or to entertain his readership with whatever photographs he may have secured, or that his films have been censored or suppressed. At bottom, he asserts that PROCCA has restricted his conduct, thereby limiting his access to the materials which he desires to record photographically. In this context, a court must readily distinguish between expression and action, for only the former is entitled to first amendment protection under the Freedom of Speech Clause. *See, e.g., Lovelace v. Southeastern Massachusetts University*, 793 F.2d 419, 425 (1st Cir.1986).

The activity in which D'Amario seeks to engage does not partake of the attributes of expression; it is conduct, pure and simple. This is not a case where the plaintiff desires to "express" himself by displaying the existing fruits of his photographic endeavors, *cf. Jacobellis v. Ohio*, 378 U.S. 184, 195, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 793 (1964) (exhibition of arguably pornographic films protected by first amendment); rather, D'Amario wishes to "do" something, namely, to enter the Center and to photograph subjects of his own choosing while they are performing.

Consequently, despite the anfractuous reasoning utilized by the plaintiff's counsel in an effort to distort the basic shape of the case, the issue before this court is not whether the plaintiff may be restricted from communicating or displaying information he has already garnered. His problem is precisely the opposite: he has come away empty-handed, having been denied license to let his camera rove at will. Seen in its true perspective, the issue is whether a photographer (or photojournalist) may have special rights of access to "information," that is, to subjects which he desires to photograph. The distinction is a critical one. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 98 S.Ct. 2588, 2593–94, 57 L.Ed.2d 553 (1978). As the Second Circuit has noted:

> To claim a value in access to information comparable to the value of freedom of expression is to ignore 200 years of First Amendment jurisprudence.

*In re Application of The Herald Co.*, 734 F.2d 93, 100 (2d Cir.1984). *See also Legi-Tech, Inc. v. Keiper*, 601 F.Supp. 371, 377 (N.D.N.Y.1984) (denial of access does not impinge upon freedom of speech).

Inasmuch as the plaintiff's rights of free speech are not implicated by the "no cam-

era" rule, the scene necessarily shifts. The constitutional principles which govern the sovereign's power to control dissemination of information become largely inapposite. The question is whether or not, in the circumstances at bar, D'Amario has any legitimate claim of entitlement to access and to collection of the information. Put another way, can a journalist be denied entree by state action to what he sees as "photo opportunities" of public interest?

## ACT III

The gathering of newsworthy data is not entirely insulated from the prophylaxis of the first amendment. The Supreme Court has recognized that the concept of a free and unfettered media necessarily implies the existence of safeguards to insure access, for "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). Such protection, however, is neither absolute nor as far ranging as freedom of speech itself. The Court has held that, "the right to speak and publish does not necessarily provide for the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). As *Branzburg* teaches:

It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.

408 U.S. at 684, 92 S.Ct. at 2658.

There is a considerable difference between, on the one hand, allowing the media to print (or to broadcast) all the news that it collects and, on the second hand, permitting the media totally unchecked access to forage whenever and wherever it pleases in search of tidbits. That difference has been noted by the Court: "The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834, 94 S.Ct. 2800,

2810, 41 L.Ed.2d 495 (1974). *See also Saxbe v. Washington Post Co.*, 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974). But, the fact that the press cannot command "special access" does not mean that a journalist's right to ferret out "news" can capriciously be restricted.

Where the public is permitted access to an event (as was the case with the concerts here at issue), there must be some reasonable justification, some legitimate basis, for any governmental obstruction of media access. And where, as at bar, access is permitted to some representatives of the media (that is, print journalists are permitted to attend the concerts with pen and paper, but photojournalists can attend only if their cameras are left behind), others cannot arbitrarily be banned. *See American Broadcasting Companies v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir.1977); *Cable News Network v. American Broadcasting Companies*, 518 F.Supp. 1238, 1244–45 (N.D.Ga. 1981). Once the door is open, limitations imposed by the sovereign must be rationally related to a permissible end.

In determining whether government possesses a sufficiently legitimate basis for excluding some, or all, press members from a newsworthy event, the Supreme Court has typically devised a balancing test. Thus, in assaying the propriety vel non of banning the press from criminal proceedings, the Court has balanced the media's right to gather information with a variety of factors such as the defendant's right to a fair trial and the imminence of threatened danger to persons or property. *See, e.g., Press Enterprise Co. v. Superior Court*, — U.S. —, —–—, 106 S.Ct. 2735, 2739–41, 90 L.Ed.2d 1 (1986); *Press Enterprise Co. v. Superior Court*, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606, 102 S.Ct. 2613, 2619–20, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579–81, 100 S.Ct. 2814, 2828–30, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale*, 443 U.S. 368, 378–79, 99 S.Ct. 2898, 2904–05, 61 L.Ed.2d 608 (1979). Courts have indulged in similar balancing

to determine the media's rights of access to civil proceedings. *E.g., Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1067–70 (3d Cir.1984). And, where less than all members of the press have been excluded from covering a particular event, a comparable process of weights and measures has been employed to gauge the validity of the partial bar. *See, e.g., WPIX v. League of Women Voters*, 595 F.Supp. 1484, 1489 (S.D.N.Y.1984) (right of equal access to televising of presidential debate is not absolute; interest to be served by proposed newsgathering activity must be balanced against interests reasonably supported by proscription of proposed activity); *Cable News Network v. American Broadcasting Companies*, 518 F.Supp. at 1245; *Borreca v. Fasi*, 369 F.Supp. 906, 909 (D. Hawaii 1974).

The rule which emerges from this caselaw is reasonably clear. Although the press cannot command access wherever, whenever, and however it pleases, neither can government arbitrarily shroud genuinely newsworthy events in secrecy. Members of the press, to their own behoof and as representatives of the public, have some (limited) claim to access when government attempts selectively to delimit the audience (or when government cooperates in enforcing such restrictions). In such circumstances, the state's rulemaking power is not absolute: if the first amendment is to retain a reasonable degree of vitality, the limitations upon access must serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access.[4]

The Center's invocation of a "no camera" rule sails past such scrutiny without discernible difficulty. Inasmuch as cer-

tain celebrity performers require implementation of the ban—indeed, as the parties have stipulated, these artists consider the condition to be "non-negotiable"—PROC-CA is caught between the devil and the deep blue sea: it either leases the hall, agreeing to prohibit cameras, or it loses the rental. Given the Center's marginal finances, and its dependency upon rock concerts for any semblance of solvency, it is plain that acquiescence in the performer's "no camera" request fulfills an important, practical purpose. There are, moreover, no countervailing public policy considerations: the rule does not carve out a suspect classification, or discriminate on the basis of some impermissible criterion (say, race or gender), or limit access in response to the *content* of the performances. The ban is color blind and viewpoint neutral.

It is worthy of mention, too, that PROC-CA tailors the limitation as narrowly as possible, consistent with its fiscal stability. Where the performer is willing to forego a "no camera" edict, the Center does not spontaneously impose one. In short, the rule is used only when necessity—the economic necessity of being able to bring a particular concert to the Center—demands.

The central aspect of the balancing process requires calibration of the values served by permitting access as opposed to those which are furthered by denying such access. In this case, the societal gains which would follow from allowing the newsgathering activity would be negligible. Members of the press (the plaintiff included) can attend, report on, and describe all concerts held at the Center—even those which come under the "no camera" rule. There is no suppression of the content of the artists' expressions. Likewise, there is no censorship of the media's portrayal of the performers and of the performances.

---

**4.** The reported case which is factually closest on point to the situation at bar is *Post Newsweek Stations-Connecticut, Inc. v. Travelers Insurance Co.*, 510 F.Supp. 81 (D.Conn.1981). In *Post Newsweek*, Chief Judge Clarie denied injunctive relief to a television station which sought camera-ready access to the Hartford Civic Center Coliseum in order to film a figure skating championship. Access had been denied because the

sponsoring group had granted exclusive television rights to another network. *Id.* at 83. Although this court endorses the result reached in *Post Newsweek*, it respectfully declines to emulate *Post Newsweek* in the use of conventional free speech analysis. In this court's view, *see ante*, access questions require a slightly different formulation.

The press remains quintessentially "free": to observe, to comment, to portray. The flow of ideas and information, the stream of meaningful communication, is not materially dammed. All that is denied is the use of photographic gear inside the arena. And, the incremental value of setting that denial aside, viewed as a matter of facilitating the public's right to know, is puny.

On the other side of the ledger, the interests to be served by enforcement of the "no camera" rule are substantial. As noted previously, it makes business sense for PROCCA, an agency heavily dependent for its solvency upon rock concert revenues, *see ante* n. 3, to honor the preferences of the artists in this regard. Arguably, PROCCA possesses somewhat greater latitude so to behave because, in respect to these rentals, it acts in a proprietary (rather than a governmental) capacity. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (municipality acts in a proprietary vein when contracting to allow paid commercial advertising within mass transit system). Generally speaking, when a state actor exercises its proprietary powers, it shares the same freedoms as, and is subject to no greater limitations than, a private firm conducting the selfsame business. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 434–435, 100 S.Ct. 2271, 2276, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976); *Post Newsweek*, 510 F.Supp. at 85–86.

There is a second salient interest which is furthered by enforcement of the "no camera" rule. Performers have protectible property interests, interests which state law validates in a variety of ways. *See, e.g.,* R.I.Gen. Laws § 9–1–23 (creating cause of action for unauthorized use of name, portrait, or picture). Few would question the rights of a singer to prohibit the unauthorized recording, and subsequent commercial exploitation, of her songs. A performer has much the same type of interest in her likeness: it is not out of place for her to judge the impact of photography upon the entertainment value of her performance and upon her career.

In any evenhanded balancing of the relevant interests, the scales tip heavily in favor of permitting the defendants to consent to, and to enforce, a "no camera" rule. That dictate serves a bona fide governmental purpose; as fashioned, it is rationally related to the accomplishment of its principal governmental objective, it is narrowly tailored to that end, and its benefits far exceed its systemic costs.

## THE FINAL CURTAIN

PROCCA's approach to the "no camera" rule cannot be faulted. The course of action which it has charted does not impinge impermissibly upon freedom of speech or freedom of the press. It is assuredly not arbitrary; any other approach would needlessly threaten the revenues to be derived from entertainment contracts and would trench upon the rights of performing artists.

The court holds that the plaintiff had no entitlement to any special sort of shutter-ready access to the events in question; that PROCCA was well within its rights to honor the contractual stipulations between Gemini and the quintet of camera-shy entertainers; and that, in enforcing the "no camera" rule, the defendants did not abridge D'Amario's first amendment rights.[5]

---

5. One short answer to D'Amario's jeremiad may well be to point out that he was allowed exactly the same access as members of the public (who were equally bound by the "no camera" rule), and that his suit must fail because, in reality, it seeks a form of "special access." Moreover, it can persuasively be argued that any right of access which D'Amario may have is, at best, a right to attend, listen, and report, as opposed to a right to film or record events. *Cf. United States v. Edwards*, 785 F.2d 1293, 1295–96 (5th Cir.1986) (per curiam). The plaintiff has not established a predicate for, and the caselaw does not reveal, any constitutional right to memorialize public events by photographic means. Yet, inasmuch as PROCCA's "no camera" rule comprises a permissible limitation on media access and passes muster under a balancing test, the court need not reach the broader questions which D'Amario's plea implies.

For these reasons, the plaintiff's amended complaint must be dismissed on the merits. There has been no showing sufficient to warrant the grant of any affirmative relief to D'Amario. Accordingly, the clerk is directed to enter judgment for the defendants, jointly and severally, for costs.

*It is so ordered.*