Marie CIRELLI, Plaintiff,

v.

TOWN OF JOHNSTON SCHOOL DIS-
TRICT, Brian G. Abdullah, in his capac-
ity as Principal of Johnston Senior High
School, Mary Ann Carroll, in her capaci-
ty as Superintendent of Schools, John-
ston School District, and Robert Plante,
in his capacity as Administrative Assis-
tant at Johnston High School, Defen-
dants.

Civ. A. No. 95–231 P.

United States District Court,
D. Rhode Island.

Aug. 28, 1995.

Marc Gursky, Providence, RI, for plaintiff.

Stephen M. Robinson, Katherine A. Merolla, of Asquith, Merolla, Anderson, Ryan & Wiley, Providence, RI, for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This is a § 1983 action alleging violation of plaintiff's First Amendment rights. Plaintiff Marie Cirelli is an art teacher at Johnston High School ("JHS") and a member of the Johnston Federation of Teachers, American Federation of Teachers, AFL–CIO Local 1702 ("AFT"). Defendants are the Johnston school district, the Superintendent, the Principal and the Administrative Assistant of JHS. Plaintiff videotaped violations of the Rhode Island Occupational Health and Safety Code in an attempt to get school officials to rectify health and safety hazards and defendants subsequently ordered plaintiff to "cease and desist" from videotaping the high school premises. She was also prohibited from releasing the videotapes she had already recorded without permission of school officials. Plaintiff seeks an order permanently enjoining the defendants from violating plaintiff's First Amendment rights. More specifically, plaintiff asks this Court to enjoin

defendants from denying plaintiff access to JHS property in order to document with a video camera numerous violations of the Rhode Island Occupational Health and Safety Code. Plaintiff further asks the Court to enjoin defendants from interfering with or restricting the release of such videotapes by the plaintiff. For the foregoing reasons, defendants are enjoined from interfering with the release of videotapes produced during non-working, non-school hours. However, plaintiff is not entitled to an *unconditional* right to enter the high school at all times. To the extent that members of the general public must participate in an application process in order to gain admittance to the school at certain times, defendants may properly subject Ms. Cirelli to the same requirements.

## I.

Plaintiff has been employed by the Johnston School District as a public school teacher since 1970. In 1980 she became an art teacher. At some point over the past several years, plaintiff experienced a number of physical ailments such as skin rashes, difficulties in breathing and headaches. Her doctor suggested that the symptoms might be related to the environmental conditions of her workplace. Plaintiff subsequently filed a grievance through the AFT in March 1994 alleging that the school administration failed to provide a clean and safe working environment. In April 1994 school officials hired ServiceMaster, a private industrial cleaning service to test the air quality in several rooms of the school. ServiceMaster concluded that the "air quality was within acceptable standards." Abdallah Aff. Schedule A. However, ServiceMaster also issued an environmental quality report in June 1994 that offered nine recommendations for improvement of the school's environmental conditions.

After having received a copy of the ServiceMaster report in November 1994, plaintiff became concerned that the ServiceMaster recommendations had not yet been implemented. She proceeded to videotape her classroom, the kiln room and some storage areas in an attempt to document possible health and safety violations. On November

20, 1994, plaintiff contacted the Rhode Island Department of Labor Division of Occupational Safety ("RIDOL–DOS") to discuss the physical conditions of the school. She also filed another grievance with her union.[1] RIDOL–DOS inspected the school the following day and prohibited use of the kiln room pending the installation of an adequate ventilation system. RIDOL–DOS also issued a compliance order directing school officials to clean certain vents. In December 1994 the school installed a new ventilation system in the kiln room. RIDOL–DOS returned to the school in December 1994 and in January 1995 for its annual inspection and subsequently issued another compliance order citing numerous violations of the Rhode Island Health and Safety Code.

At the end of January 1995 during non-school, non-working hours, plaintiff videotaped the physical conditions at JHS, apparently for the purpose of proving to the appropriate health and safety officials that unhealthy and unsafe conditions continued to exist at the school and were not being remedied. On January 27, 1995 defendant Abdullah ordered plaintiff to "cease and desist" all videotaping and prohibited her from releasing any videotapes without the permission of school officials. Throughout this period and the following months, plaintiff sent a number of memoranda to school officials regarding specific concerns about the physical conditions of the building. Tension continued to mount between plaintiff and some members of the JHS maintenance staff.[2]

In April 1995 RIDOL–DOS reinspected JHS and issued a letter stating that its inspection reflected 100% compliance with its compliance orders. However, in May 1995, the Battalion Chief of the Johnston Fire Department inspected JHS and found a number of fire code violations. According to his affidavit, the majority of these violations involved ordinary wear and tear. See Zalabowski Aff. at 1. On July 27, 1995 James Larisa, the RIDOL–DOS Safety Compliance Officer who had previously inspected JHS conducted a thorough inspection of the

school. At that time he found no health or safety violations. See Larisa Aff. at 3.

## II.

■ The First Amendment right of a government employee to comment on matters of public concern, provided that the employee's First Amendment interest is not outweighed by the government's interest in the efficient performance of its public duties is well-settled. See Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811; Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708; O'Connor v. Steeves, 994 F.2d 905, 912 (1st Cir.1993) (citations omitted); Brasslett v. Cota, 761 F.2d 827, 839 (1st Cir.1985). More simply put, a Court must, as a matter of law, (1) determine whether the employee's speech is of "public concern" or merely involves a private matter; and (2) balance the employee's and the public's interest in communicating and receiving, respectively, the information, against the government employer's interest in the effective operation of its public service. Pickering, 391 U.S. at 568, 88 S.Ct. at 1734.

■ The threshold inquiry, therefore, is whether plaintiff is "commenting" (through the medium of her videocamera) on a matter of public concern. The Supreme Court has defined a matter of public concern as a one "relating to [a] matter of political, social or other concern to the community." Connick, 461 U.S. at 146, 103 S.Ct. at 1690. Applicable case law overwhelmingly supports the proposition that the health and safety of the JHS staff and students is a matter of public concern. See, e.g., Johnsen v. Independent Sch. Dist., 891 F.2d 1485, 1490 (10th Cir. 1989) (school nurse's comments about school's medication policy is of public concern as it "potentially impacts the health of the children attending the school"); Luethje v. Peavine Sch. Dist., 872 F.2d 352, 355 (10th Cir.1989) ("[p]laintiff's complaints about unsanitary practices in the school's cafeteria

---

1. Plaintiff filed four additional related grievances during the 1994–95 school year.

2. In fact, the non-teaching union has apparently advised defendant Carroll that it will be filing a grievance involving plaintiff's videotaping activities. Defs.' Proposed Findings of Fact at ¶ 20.

and the administration's refusal to address them clearly dealt with matters of public concern").

■ Defendants contend that plaintiff's actions are simply a matter of private concern, namely, "her allergy to dust and her desire to have the school department do all of the cleaning in her room despite the fact that this is not the policy of the department." Prehearing Mem. of Law of Defs. at 30. It is true, and plaintiff concedes, that her awareness of possible health and safety issues at the high school was triggered by her personal health problems and her doctor's suggestion that her conditions may be related to her work environment. *See* Cirelli Aff. at 1–2. However, plaintiff's personal interest in an issue that potentially affects all of the members of the staff and student body does not strip such issue of its public nature. As the District of Columbia Circuit recognized, "[A] matter is not of public concern *merely* because it grows out of a disagreement between government officials (citation omitted). But neither does a topic otherwise of public concern *lose* its importance merely because it arises in an employee dispute." *Hall v. Ford*, 856 F.2d 255, 260 (D.C.Cir.1988) (emphasis in original).

■ Having concluded that the plaintiff's speech is of public concern, the more pressing question is whether plaintiff's speech is to be afforded First Amendment protection in light of the *Pickering* balancing test. On the plaintiff's side, I must consider her interest in speaking, as well as the interest of the public in having access to the plaintiff's speech. The First Circuit has evaluated both the character and effect of the speech, including its veracity, in determining the employee's interest. *Brasslett*, 761 F.2d at 839. On the defendants' side, I must consider the government's interest in the effective functioning of its enterprise. Specifically, I will assess "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPher-*

*son,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) (citing *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37).

Because I have already determined that the health and safety of the Johnston High School staff and students is a matter of important public concern, I need not reiterate this interest in detail. It is sufficient to note that the citizens of the Johnston community, as taxpayers, have a right to know the conditions in which their public buildings are being maintained. Furthermore, and perhaps even more significant, is a parent's interest in having access to information about potential safety hazards his or her child may face every day.

It is difficult for this Court to assess the "truth" of the "statements" made by plaintiff. The statements, in this case, are videotapes and "speak" for themselves. While there were no violations of Rhode Island health and safety laws at the time of the most recent inspection by RIDOL–DOS, *see* Larisa Aff. at 3, the most recently recorded videotapes (July 27 and 28, 1995) reflect physical conditions which certainly are cause for some concern. For example, the tapes revealed cracked windows, exposed electrical wires, poorly functioning air vents and broken floor tiles. Pl.'s Ex. 13 and 14. I am convinced that these videotapes are true and accurate photographs of Johnston High School and that, therefore, the veracity of these "statements" is unquestionable.

Defendants contend that there are several factors that weigh in their favor on the *Pickering* scale. Most importantly, they cite the disruption to the educational process and the possible violation of state and federal privacy laws by the photographing of students. Although not explicitly argued, defendants also suggest that the fact that plaintiff's actions have resulted in a negative public image of the school tips the scale further in their favor. I will address each of these propositions in turn.

Defendant Abdullah, Johnston High School's principal, has concisely summarized his concern about disruptions as a result of plaintiff's actions:

The actions of Mrs. Cirelli have clearly been disruptive to the educational process and environment and have seriously affected the ability of the administrative staff to operate the high school in an efficient and proper manner. I and other members of the administrative staff have spent countless hours in responding to Mrs. Cirelli's verbal and written statements, in dealing with complaints voiced by members of the maintenance staff, in holding meetings to try to alleviate the tension caused by confrontations, and in accompanying maintenance personnel to Mrs. Cirelli's classroom when they perform work. This situation cannot be tolerated. We simply do not have the administrative staff to deal with these problems, and the time and resources which has been devoted to these issues have seriously affected our ability to deal with the important business of operating a senior high school.

Abdullah Aff. at 5. Defendants have also noted that the maintenance staff has complained that the plaintiff is following them around with a camera and disrupting their work. Apparently, in one instance, plaintiff photographed a maintenance man on a ladder with a flash, thereby causing him to lose his balance and almost fall off the ladder.

These are significant concerns. To the extent that Ms. Cirelli's videotaping does cause disruptions to the internal affairs of the school, defendants are correct that this affects the *Pickering* balancing test. However, I must observe that much of the claimed disruptions appear to be a result of plaintiff's verbal and written complaints, as well as the grievances she has filed through her union.[3] In other words, it is probable that the meetings and mediation sessions involving the time and energy of the administrative staff would continue even in the absence of plaintiff's videotaping. Thus, this Court cannot fairly attribute a significant amount of the cited disruption to plaintiff's videotaping, which is, of course, the subject of this litigation.

The issue of the plaintiff's interactions with the maintenance staff, however, do obviously directly implicate her videotaping activities. The fact that the non-teaching union has advised the superintendent that a grievance is forthcoming involving the videotaping is indicative of the discord that has occurred during the past school year. *See* Carroll Aff. at 5. On the other hand, I am not entirely persuaded that the relationship between plaintiff and the members of the maintenance staff constitutes a "close working relationship[ ] for which personal loyalty and confidence are necessary." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. While strained personal and professional relationships are never a desirable situation, it must be acknowledged that plaintiff and the maintenance staff perform entirely different functions within the infrastructure of the school.

The incident involving the flash photography and the defendants' concern for the privacy of their staff and students involve a similar analysis. These concerns are considerable, however, they ultimately play no role in this Court's balancing test. At issue is the plaintiff's right to comment on the physical conditions of the school through the use of a videocamera. The plaintiff does not seek First Amendment protection for the videotaping of the school's staff and students and this Court has no intention of granting the plaintiff protection for such activity.

 Finally, defendants have expressed their concern over the negative publicity the school has received as a consequence of plaintiff's activities and the resulting lack of public confidence in the school system. *See* Abdullah Aff. at 7, Plante Aff. at 4, Carroll Aff. at 5. They do not explicitly include these concerns as part of their *Pickering* analysis, but the implication is clear that defendants believe this factor weighs against First Amendment protection of plaintiff's videotaping activities. As an initial matter, it seems obvious that the exercise of First Amendment rights cannot be conditioned upon whether the image of the government

---

**3.** See, for example, Administrator Plante's affidavit wherein he discusses the numerous memoranda sent by plaintiff to the school's administration and the time spent addressing them. Plante Aff. at 3. The great majority of these memoranda are completely unrelated to videotaping activity of any kind.

entity in question is adversely impacted. If this were the case, then nearly every litigation involving a government employee's First Amendment rights would result in the denial of those rights. That is, the government rarely challenges an employee's right to speak where the speech is complimentary. Furthermore, the school board has every right to publicly respond to plaintiff's criticisms and sway public opinion if they are able. This response to negative publicity, rather than outright censure, is far more consistent with principles embodied in the First Amendment. As Justice Brandeis wrote, "[T]he remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).[4] I will not consider negative publicity as a factor in the *Pickering* balancing test.

It is clear that given the fact that plaintiff is speaking on a matter of public concern, and that application of the *Pickering* balancing test weighs in plaintiff's favor, defendants may not properly prohibit plaintiff from releasing the videotapes she has previously recorded or any she may properly record in the future.

### III.

■ A more complicated issue concerns plaintiff's intended *future* videotaping activities. Defendants have presented a compelling argument in support of their position that the First Amendment guarantees no "right of access," citing *D'Amario v. Providence Civic Center Auth.*, 639 F.Supp. 1538 (D.R.I.1986), *aff'd*, 815 F.2d 692 (1st Cir.), *cert. denied*, 484 U.S. 859, 108 S.Ct. 172, 98 L.Ed.2d 125 (1987).[5] D'Amario was a photojournalist who sought access to the Civic Center in order to take photographs of the performers and sell the pictures for profit. The Civic Center had a "no camera" rule, primarily because most performers would not per-

form at the Civic Center without such a rule. The Court applied the following test:

> Although the press cannot command access wherever, whenever, and however it pleases, neither can government arbitrarily shroud genuinely newsworthy events in secrecy.... [T]he state's rulemaking power is not absolute: if the first amendment is to retain a reasonable degree of vitality, the limitations upon access must serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access.

*D'Amario*, 639 F.Supp. at 1543. The Court found that the Civic Center's rule met this test easily, in light of the fact that the solvency of the Civic Center was at stake: without the "no camera" rule, many performers simply would not lease the concert hall. It also determined that there were no countervailing public policy considerations.

Defendants contend that unconditional access to the JHS grounds would result in serious interruption to the administrators' work because they would be required to assign an administrator to accompany plaintiff for safety and security reasons. Abdullah Aff. ¶ 7. Apparently the high school is not open for use by the general public. In order to use the building, a group must file an application with the superintendent of schools who must secure approval from the superintendent of buildings and grounds and the school committee. With the exception of several specified groups, the school charges a fee for use of the facilities. Carroll Aff. at 1–2. Defendants also protest that "teachers only have a limited license to be on the high school premises for teaching and academically-related activities. No teacher has the right to wander about the building unsupervised at any time." Carroll Aff. at 2.

Plaintiff insists that *D'Amario* is inapposite as plaintiff does not seek relief on a right of access claim:

---

4. I also note, not without some irony, that the majority of what can be termed "bad publicity" for the school has been inextricably intertwined with the defendants' prohibition of the release of videotapes.

5. In granting plaintiff's motion for a temporary restraining order, I concluded that *D'Amario* was inapplicable to the facts before me. However, upon further consideration, I have determined that, to a limited extent, *D'Amario* is relevant to the instant matter.

In her Motion for a Temporary Restraining Order, plaintiff asked the Court to enjoin plaintiff from denying access for the purpose of videotaping. Apparently defendants are confusing right of access under the First Amendment whereby an individual is seeking relief from being barred from a public place, and Ms. Cirelli's request, whereby she is requesting that the defendants allow her to videotape health and safety violations within the school building.

Pl.'s Pretrial Mem. at 11. Furthermore, they contend that even if this Court were to apply a "right of access" analysis, the facts in *D'Amario* are clearly distinguishable from the instant situation. Where *D'Amario* sought to sell his photographs for economic gain, plaintiff seeks to videotape for the purposes of petitioning the government for redress of her grievances and to inform the public about the health and safety conditions of the school. Likewise, plaintiff argues that defendants have no legitimate interest in restricting dissemination of information on health and safety issues.

■ In my view, plaintiff's claim for relief is only partially based on a right of access claim. Where plaintiff is already properly on school grounds, for example, prior to the start of her class, while teaching, or after class but before the building closes for the evening, she needs no "access," as she already has access, as demonstrated by her very presence in the building at these times. Thus, provided that plaintiff continues to restrict her videotaping activities to non-school, non-working hours,[6] defendants have no basis in law to prohibit such activity. On the other hand, where plaintiff wishes to videotape on the weekends, for example, or during other times that groups would normally be required to apply for permission in order to enter the building, a right of access claim is implicated. In that case, application of the *D'Amario* test proves favorable to defendants. While defendants have no economic interest, as the Civic Center did, defendants do have an interest in the efficient use of its administrative personnel. Requiring defendants to permit access to plaintiff at all times would result in a considerable disruption to the work of the person assigned to accompany Ms. Cirelli throughout the building, as well as any other personnel required to be on hand. While I agree with plaintiff that the defendants have no legitimate interest in prohibiting the *dissemination* of the fruits of plaintiff's labors, defendants *do* have a legitimate interest in restricting unconditional *access* to the school building. Thus, if plaintiff wishes to videotape at these times, she must abide by the application process generally applicable to other members of the public.

IV.

For the reasons set forth above, defendants are hereby enjoined from prohibiting the release of videotapes produced during non-working, non-school hours. However, to the extent that members of the general public must participate in an application process in order to gain admittance to the school at certain times, defendants may properly subject Ms. Cirelli to the same requirements.

SO ORDERED.

■

---

6. More specifically, plaintiff may videotape while she is properly in the building, but classes are not in session. For example, she may videotape from the time the building opens in the morning until the time that classes begin. She may also videotape after classes end for the day until such time as teachers are required to leave the building.